UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 1625 RIVIERA HOMEOWNERS ASSOCIATION,<br><br>          Plaintiff,<br><br>     v.<br><br>UPONOR, INC.,<br><br>          Defendant. | Case Nos.  25-cv-07176-EMC<br><br>          25-cv-07180-EMC<br><br><br>**ORDER DENYING MOTION TO COMPEL ARBITRATION; GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS** |
| BINKLEY ET AL,<br><br>          Plaintiffs,<br><br>     v.<br><br>UPONOR, INC.,<br><br>          Defendant. | Docket No. 25, 23 |

## I.      **INTRODUCTION**

In two related cases, Plaintiffs sue Defendant Uponor, a piping manufacturer, alleging that Uponor's pipes prematurely degrade and leak.  Plaintiff 1625 Riviera Homeowners Association seeks to represent a putative class of condominiums, and brings claims in Strict Products Liability, Negligence, violation of the California Unfair Competition Law (UCL), and Unjust Enrichment. The Binkley Plaintiffs – including plaintiffs Larry Binkley, Gerald Chan, Orville Vogelgesang, and Ronelli Lising –  seek to represent a putative class of homeowners.  The Binkley Plaintiffs bring the same claims as Plaintiff Riviera, as well as additional claims for violation of the California Consumer Legal Remedies Act (CLRA), California False Advertising Law (FAL), Song Beverly Consumer Warranty Act, Breach of Implied Warranty of Merchantability, and Fraud

by Concealment.

Defendant Uponor moves to compel both sets of plaintiffs to arbitration based on an arbitration clause in its warranty agreement.  In the alternative, Uponor moves to strike Plaintiffs' class allegations and dismiss for lack of standing and failure to state a claim on all counts.

Having considered the briefing and the parties' oral argument, the Court **DENIES** Uponor's motion to compel arbitration.  The Court **GRANTS** in part and **DENIES** in part Uponor's motion to dismiss and strike.

## II.     FACTS AND BACKGROUND

Uponor, an Illinois corporation, is a manufacturer and seller of piping products.  Both the instant lawsuits concern alleged deficiencies in Uponor's AquaPEX piping product.  Case No. C25-7180, Dkt. No. 1 ("Binkley Compl.") ¶ 20;  Case No. C25-7176, Dkt. No. 24 ¶¶ 1-3 ("Riviera FAC").  The AquaPEX pipes are made from cross-linked polyethylene (PEX).  Uponor manufactured the AquaPEX pipes from 2010 to 2021.  Binkley Compl. ¶ 4; Riviera FAC ¶ 20, 42.  In 2021, Uponor discontinued manufacture of the pipes.  *Id.*

### A. 1625 Riviera Homeowners Association Lawsuit

Plaintiff 1625 Riviera Homeowners Association is a common interest development consisting of 48 condominiums and common areas in Walnut Creek ("the Development").  Riviera FAC ¶ 3.  Plaintiff Riviera is responsible for maintaining and repairing the common areas, which include plumbing systems.  *Id* ¶ 11.  Plaintiff does not own the common areas.  *Id*.  Rather, the condominium owners each own a $1/48^{th}$ interest in the common area.  *Id.* ¶ 17.  However, the owners cannot modify, change, or control the common area.  *Id.*

The Development was created by Development Solutions Riv LLC.  *Id.* ¶ 18. Development Solutions used a general contractor, who used a plumbing subcontractor, who bought Upnor AquaPEX piping from a plumbing supply house, which brought the pipe from Uponor or a distributor.  *Id.*  Plaintiff alleges that it received no warranty from Uponor or anyone else, and has made no warranty claim to Uponor.  *Id.*

United States District Court
Northern District of California

In September, 2023, Plaintiff discovered a leak in its Uponor piping.  *Id.* ¶ 39.  Since then, Plaintiff has discovered seven to ten leaks, at the cost of approximately $20,000 per leak to repair.  *Id.*  Because the Uponor piping is installed primarily in walls, leaks damage surrounding building elements and repair necessarily damages other building components.  *Id.* ¶ 40.  Plaintiff alleges that there is no way to remove the piping without opening the walls.  *Id.*

1625 Riviera's Product Liability Theory

Plaintiff alleges that cross-linked polyethylene (PEX) is susceptible to degradation when exposed to oxygen.  *Id.* ¶ 24.  Antioxidants can prevent oxidation by neutralizing the molecules that initiate the chemical reaction.  *Id.* ¶ 25.  Once antioxidants are depleted, however, the pipes become vulnerable to embrittlement and cracking.  *Id.* ¶ 26.

Uponor coats its pipes with red and blue coating.  *Id.* ¶ 27.  Because coatings do not stick to PEX, Uponor patented a process that oxidizes the outer surface of the pipe through a flame treatment.  *Id.* ¶¶ 27-28.  This improves adhesion of the color coatings but has the additional consequence of removing antioxidants on the outside of the tubing.  *Id.* ¶ 28.  Depleted of antioxidants from the coating process, the outside surface becomes vulnerable to oxidation.  *Id.* ¶¶ 28-29.  The oxidation causes embrittlement and cracks, ultimately leading to early leakage.  *Id.*

**B. Binkley Lawsuit**

The Binkley Plaintiffs are homeowners whose homes have Uponor piping installed.  None of the plaintiffs have asserted claims under Uponor's warranty, and each claim to have been unaware of the warranty.  Binkley Compl. ¶¶ 28, 40, 56, 70-72, 83-84.  Moreover, all the plaintiffs allege that they were unaware that Uponor piping was installed in their homes before the leaks.  *Id.* ¶¶ 39, 55, 69, 82.  All of the plaintiffs allege that the temperature and pressure in their homes were within levels Uponor claims their pipes can tolerate.  *Id.* ¶¶ 38, 54, 68, 81.

- Larry Binkley experienced cracks and leaks in his piping in 2013.  *Id.* ¶ 25.  In 2023, he twice experienced a leak that damaged walls and flooring.  *Id.* ¶¶ 26-27.  In 2025, his pipes again leaked, causing ceiling damage and drywall damage.  *Id.* ¶¶ 28-29.  Mr.

United States District Court
Northern District of California

Binkley ultimately removed and replaced all his Uponor piping with copper pipes to prevent further damage. *Id.* ¶ 32. In total, Mr. Binkley claims to have incurred over $50,000 in property damage from the leaking pipes and in replacing the defective piping. *Id.* ¶ 34.

- Gerald Chan purchased his house, which had Uponor piping, in 2018. *Id.* ¶¶ 41-42. In 2022, the piping leaked on five separate occasions, causing property damage to his kitchen, ceiling, and living room. *Id.* ¶¶ 44-47. In total, Chan experienced 14 instances of cracks and leaking. *Id.* ¶ 49. He had to cut out multiple areas of drywall to make necessary repairs. *Id.* ¶ 51. Chan ultimately removed and replaced all his Uponor piping with copper pipes to prevent further damage. *Id.* ¶ 52.

- Orville Vogelgesang purchased his house, which had Uponor piping, in 2012. *Id.* ¶ 58. In June, 2025, Vogelgesang experienced two leaks. *Id.* ¶¶ 59-60. The leak caused property damage to insulation, drywall, and paint, as well as repair costs. *Id.* ¶¶ 63-64. He experienced a second leak a few months later. *Id.* ¶ 66.

- Ronelli Lising bought her house, which has Uponor piping, in 2018. *Id.* ¶ 74. In 2024, she experienced leaks that required the removal and replacement of significant areas of drywall and repair to damaged insulation and paint. *Id.* ¶ 76. In total, she incurred more than $11,000 costs from the piping failure. *Id.* ¶ 77.

The Binkley Product Defect Theory

The Binkley Plaintiffs allege that PEX (polyethylene) is vulnerable to degradation through oxidation. *Id.* ¶ 12. This, according to Plaintiffs, is due to Uponor's use of the Engel method of cross linking polyethene. *Id.* ¶ 91. The high heat and chemical reactions during this process consumes antioxidants prematurely. *Id.* ¶ 92. Exposure to air and water then causes oxidation, which leads to brittleness and cracking in the polyethene. *Id.* ¶¶ 95-96. To prevent premature degradation, Uponor blends antioxidant additives into the polyethylene. *Id.* ¶ 13. However, according to Plaintiffs, Uponor's method of pipe production fails to mix these antioxidants uniformly with the polyethylene. *Id.* ¶ 14. The uneven distribution of the antioxidants means that

4

some areas of the polymer are less protected against oxidants. *Id.* ¶¶ 15, 117.

The oxidation problem is compounded by Uponor's use of a lacquer coating in its Red and Blue pipes to provide color. *Id.* ¶ 106. To make the lacquer coating adhere, high temperatures are used that destroy antioxidants on the surface of red and blue Uponor pipes. *Id.* ¶¶ 99, 106. The color-coated surfaces experiences embrittlement, leading to cracks. *Id.* ¶¶ 100, 107. The pipes then fail from the outside in. *Id.* ¶ 103.

Plaintiffs allege that the fitting installation process further exacerbates the oxidation degradation. *Id.* ¶ 110. Uponor's installation systems requires the inside diameter of the pipe to be expanded while the pipe is cold and stretched to insert fittings. *Id.* When the pipe retracts over the fittings, the fittings remaining larger than the inside diameter of the pipe, creating stress concentration at the edge of the reinforcement ring installed over the fittings. *Id.* ¶¶ 111-112. This stress leads to cracks in the pipe around the reinforcement rings. *Id.* ¶ 112.

### C. The Uponor Warranty

According to Uponor, all PEX piping sold by Uponor in the United States from 2010 onward comes with a limited product warranty. Riviera Docket, Dkt. No. 25-2 (Declaration of Stacey Beissel); Binkley Docket, Dkt. No. 23-1 (Declaration of Stacey Beissel). The warranties were in effect from 2006 onwards. *Id.* at ¶ 4. The warranty was updated in 2012 and again in 2019. Riviera Docket, Dkt. No. 25-3; Binkley Docket, Dkt. No. 23-2. The Warranties by their terms applied to "owner(s) of the real property in which such products [Uponor's piping] are installed." Binkley Docket, Dkt. No. 23-2. All the warranty agreements contained arbitration clauses, reproduced below in relevant part:

2006 Warranty:

**Warranty Claim Dispute Process:**

If You believe Uponor has failed to comply with its obligations set forth in this limited warranty, You should send a written complaint detailing the alleged failure(s) to Uponor, Attn: Warranty Claim Dispute Resolution, at the address set forth above under "Warranty Claim Process". You and Uponor shall in good faith discuss and

attempt to resolve such warranty claim dispute through informal means. If such informal dispute resolution process proves unsuccessful after thirty (30) days, or if there is any other claim or dispute between the parties in any way regarding the design, manufacture, sale, distribution or condition of any product, whether such claim or dispute is based on contract, warranty, tort or otherwise, then either party may submit the dispute to the American Arbitration Association or its successor (the "Association") for arbitration, and any arbitration proceedings shall be conducted before a single arbitrator in the Minneapolis, Minnesota metropolitan area.
[. . .]
Except as provided below, You and Uponor must arbitrate any and all claims which in any way relate to Uponor's products, including, without limitation, allegations of non-compliance with the terms of this limited warranty, non-compliance with the warranty claim dispute process, and any other claims related to the design, manufacture, sale, distribution or condition of the products, whether based on contract, warranty, tort or otherwise. NOTWITHSTANDING THE FOREGOING, NEITHER YOU NOR UPONOR SHALL BE ENTITLED TO ARBITRATE ANY CLAIMS AS A REPRESENTATIVE OR MEMBER OF A CLASS, AND NEITHER YOU NOR UPONOR SHALL BE ENTITLED TO JOIN OR CONSOLIDATE CLAIMS WITH ANY OTHER PARTIES IN ARBITRATION; RATHER, ANY SUCH CLASS ACTION SHALL BE DECIDED BY LITIGATION BROUGHT IN THE FEDERAL OR STATE COURTS SITUATED IN THE STATE OF MINNESOTA.

2012 Warranty:

**Warranty Claim Dispute Process:**

In the event claimant and Uponor are unable to resolve a claim through informal means, the parties shall submit the dispute to the American Arbitration Association or its successor (the "Association") for arbitration, and any arbitration proceedings shall be conducted before a single arbitrator in the Minneapolis, Minnesota metropolitan area. NOTWITHSTANDING THE FOREGOING, NEITHER THE CLAIMANT NOR UPONOR, INC. SHALL BE ENTITLED TO ARBITRATE ANY CLAIMS AS A REPRESENTATIVE OR MEMBER OF A CLASS, AND NEITHER THE CLAIMANT NOR UPONOR SHALL BE ENTITLED TO JOIN OR CONSOLIDATE CLAIMS WITH ANY OTHER PARTIES IN ARBITRATION OR IN LITIGATION BY CLASS ACTION OR OTHERWISE.

2019 Warranty:

**Warranty Claim Dispute Process:**
In the event claimant and Uponor are unable to resolve a claim through informal means, the parties shall submit the dispute to the American Arbitration Association or its successor (the "Association") for arbitration, and any arbitration proceedings shall be conducted

6

before a single arbitrator in the Minneapolis, Minnesota metropolitan area. NOTWITHSTANDING THE FOREGOING, NEITHER THE CLAIMANT NOR UPONOR, INC. SHALL BE ENTITLED TO ARBITRATE ANY CLAIMS AS A REPRESENTATIVE OR MEMBER OF A CLASS, AND NEITHER THE CLAIMANT NOR UPONOR SHALL BE ENTITLED TO JOIN OR CONSOLIDATE CLAIMS WITH ANY OTHER PARTIES IN ARBITRATION OR IN LITIGATION BY CLASS ACTION OR OTHERWISE

According to Uponor, the effective Warranty was publicly available on Uponor's website from 2010 onward. Binkley Docket, Dkt. No. 23-1 ¶ 5. The Warranty was also "referenced in many of Uponor's marketing materials, including Uponor's Professional Plumbing Installation Guide." *Id.* ¶ 6. Specifically, the Guide states that "the 25-year limited warranty for Uponor PEX-a systems is only valid when both Uponor PEX-a pipe and Uponor ProPEX fittings are used," that mixing PEX pipe with other manufacturer's expansion rings or pipes will limit the Warranty, and instructs readers to visit Uponor's website for complete Warranty details. *Id.*

## III.   LEGAL STANDARD

To overcome a Rule 12(b)(6) Motion to Dismiss after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014). The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). But "allegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Levitt*, 765 F.3d at 1135 (quoting *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014)). "A claim has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550

7

U.S. at 556).

## IV.    DISCUSSION

### A.  Motion to Compel Arbitration

The Federal Arbitration Act requires district courts to compel arbitration if a valid arbitration agreement exists and applies to the claims at issue.  *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022).   "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986).  When the causes of action are based in state law, whether a contract was formed turns on state contract law.  *Berman*, 30 F.4th at 855.  "To form a contract under California ... law, there must be actual or constructive notice of the agreement and the parties must manifest mutual assent."  *Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1154 (9th Cir. 2025).  As a general rule, "silence or inaction does not constitute acceptance of an offer." *Norcia v. Samsung Telcoms. Am., LLC*, 845 F.3d 1279, 1284 (9th Cir. 2017) (*citing Golden Eagle Ins. Co. v. Foremost Ins. Co.*, 20 Cal. App. 4th 1372, 1385 (Cal. App. 1993).  Even where an exception to this general rule might apply, "courts have rejected the argument that an offeree's silence constitutes consent to a contract when the offeree reasonably did not know that an offer had been made." *Norcia*, 845 F.3d at 1285.

In California, warranty law and contract law "are governed by different sets of rules." *Norcia,* 845 F.3d at 1288.  Cal. Com. Code § 2313, which governs express warranties, provides that express warranties are created by "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain."  In *Weinstat*, a California Court of Appeal noted that a "bargain" in the context of warranty law is "distinguishable" from a traditional "contract."   *Weinstat v. Dentsply Internat., Inc.*, 180 Cal. App. 4th 1213, 1230 (Cal. App. 2010).  Thus, a seller's representations about its good could become part of the bargain between seller and buyer even if made after the legal formation of a contract.  *Id.*  Language in warranties is only "'contractual' in the sense that it creates binding, legal obligations on the seller" — warranties typically do "not impose any independent obligation

United States District Court
Northern District of California

on the buyer outside of the context of enforcing the seller's promises." *Norcia*, 845 F.3d at 1288 (citing *Weinstat*, 180 Cal. App. 4th at 1228). In short, a warranty does not have the same kind of bilateral obligations that define a contract.

In *Norcia v. Samsung*, the Ninth Circuit applied this distinction between warranty and contract law in deciding whether a buyer was bound by an arbitration clause contained within a warranty brochure. *Id.* at 1288. It was undisputed that plaintiff had not expressly consented to anything contained within the warranty brochure, but Samsung argued that the warranty brochure was analogous to a shrink-wrap contract. *Id.* at 1286. The panel rejected this argument, holding that when a seller provides a warranty brochure with its sale of a product, a reasonable person would "not be on notice that the brochure contained a freestanding obligation outside the scope of the warranty" and would not "understand that receiving the seller's warranty and failing to opt out of an arbitration provision contained within the warranty constituted assent to a provision requiring arbitration of all claims against the seller, including claims not involving the warranty." *Id.* at 1290.

Here, Uponor does not argue that any of the plaintiffs expressly agreed to the Warranty. Nor does Uponor argue, as in *Norcia*, that the Warranty is provided along with the piping when it is sold such that it is analogous to a "shrink-wrap" agreement. Rather, Uponor submits only that the Warranty, was "publicly available on Uponor's website during the entire class period, and it was referenced in many of Uponor's marketing materials, including Uponor's Professional Plumbing Installation Guide." Dkt. No. 25 at 7.

The closest analogue for the constructive contract formation Defendant claims is the browsewrap, where terms are provided on a website that purport to bind an individual even if that individual never visits the page hosting the browsewrap agreement or even knows that it exists. *See e.g.*, *Be In, Inc. v. Google Inc.*, No. 12-CV-03373-LHK, 2013 U.S. Dist. LEXIS 147047, at *23 (N.D. Cal. Oct. 9, 2013). Courts are generally reluctant to enforce such agreements because they often leave users "unaware that contractual terms were even offered, much less that continued use of the website will be deemed to manifest acceptance of those terms." *Oberstein v. Live Nation Entm't, Inc.*, 60 F.4th 505, 513 (9th Cir. 2023). Where there is no evidence that the user

had actual knowledge of the agreement, the validity of the browsewrap agreement typically turns on whether a reasonably prudent user was on inquiry notice of the terms of the contract. *See Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014).

As an initial matter, the purported formation here is even more attenuated than in the typical browsewrap case. In a browsewrap case, it is at least established that the plaintiff visited the website in question. But in this case, there is no evidence that Plaintiffs were aware of Uponor's website at all or had any reason to visit it. The Binkley Plaintiffs are homeowners whose homes had Uponor piping installed at the time they purchased them. They did not purchase the piping from Uponor or its distributor. There were, instead, intermediaries between them, including, *e.g.*, the prior owner or developer of the house, the general contractor, and the plumbing subcontractor. The Binkley Plaintiffs have submitted that they were not aware that Uponor piping was used in their homes until after the leaks occurred. Similarly, Plaintiff Riviera is a homeowner's association that was formed after the Riviera development was finished, that is, after the piping was installed. Plaintiff Riviera played no role in the piping installation, which was handled by the project developer Development Solutions Riv LLC, through several layers of contractors and subcontractors.

Neither set of plaintiffs are alleged to have been involved in the selection of Uponor piping. Neither contracted specifically to have Uponor piping installed. In other words, none of plaintiffs were reasonably on notice as to the Warranty's existence.[1] *See also Shuman v. SquareTrade Inc.*, 2020 WL 12894954, at *14-15 (N.D. Cal. Aug. 31, 2020) (no agreement to arbitrate was formed when the relevant terms and conditions were not provided to the plaintiff even if they may have been available in store); *Matzdorf v. Uponor, Inc.*, 2022 WL 17547941, at *7-8 (D. Colo. Aug. 24, 2022) (denying Uponor's arbitration motion where there was no evidence

---

[1] Defendant argues that Uponor's Professional Plumbing Installation Guide references the Warranty and instructs readers to visit Uponor's website for complete Warranty details. Dkt. No. 25 at 9; Dkt. No. 25-4 (Uponor Professional Plumbing Installation Guide) at p.23. But nothing in this short reference would put a person on notice that the Warranty agreement contains terms unrelated to a warranty (in contrast to say, a reference to general terms of use). Nor is there any indication that any of the plaintiffs reviewed this installation guide, or would have had reason to review it.

<div style="margin-left:auto">United States District Court<br>Northern District of California</div>

the plaintiff assented).

Even if plaintiffs had been on notice that Uponor offered a Warranty agreement, Uponor would need to further show that plaintiffs were on notice that the Warranty agreement "contained a freestanding obligation outside the scope of the warranty" that would require arbitration of non-warranty claims. *Norcia*, 845 F.3d at 1289. Given the Ninth Circuit's holding that a plaintiff is not put reasonably on notice to such an arbitration provision from mere the receipt of a warranty agreement, plaintiffs here cannot be said to have been reasonably on notice of the arbitration provision.

The limited authority Uponor offers to support assent is not on point. In *Hoekman v. Tamko Bldg. Prods., Inc.*, No. 214CV01581TLNKJN, 2015 WL 9591471, at *3 (E.D. Cal. Aug. 26, 2015),[2] the district court held that plaintiffs' reliance on representations contained in marketing materials that also referenced the seller's warranty showed that plaintiffs had notice of the warranty. But here, Uponor has not shown that any of the plaintiffs reviewed marketing materials that referenced the warranty. Uponor also attempts to rely on *Colgate v. JUUL Labs, Inc.*, 402 F.Supp.3d 728, 756 (N.D. Cal. 2019) but the issue there was whether a plaintiff's express warranty claim was precluded by the defendant's actual warranty, which was available on its website. Charging the plaintiff with notice of the warranty on the defendant's website in *Colgate* only limited the plaintiff's right to assert an express warranty claim on other grounds; it did not implicate "a freestanding obligation that limits a buyer's rights outside of the scope of warranty itself." *Norcia*, 845 F.3d at 1288. Indeed, when the district court reached the issue of arbitration elsewhere in the order, it *denied* the defendant's motion to compel arbitration due to plaintiffs' lack of inquiry or actual notice of the arbitration provision. *Colgate*, 402 F. Supp. 3d at 766.

To the extent that Uponor argues for assent on an agency theory, this argument also fails. In California, the knowledge of an agent is generally imputed to the principal, even when the agent does not actually convey it. *See* Cal. Civ.Code § 2332; *Granberg v. Turnham*, 166 Cal.App.2d 390, 395 (1958). Here, however, neither plaintiff was the principal in an agency relationship with

---

[2] This decision also predates *Norcia* and it is not clear that it survives it.

any party that might reasonably have had knowledge of the Warranty. The Binkley Plaintiffs bought their homes with Uponor piping already installed; the relationship between seller and buyer is not a principal-agent one. Similarly, Plaintiff Riviera was established *after* the project developer Development Solutions Riv LLC purchased and installed the piping through several layers of contractors. The knowledge of those contractors perhaps may be imputable to Development Solutions Riv LLC as principal, but no authority supports further imputing that knowledge to Plaintiff Riviera, which is a separate entity from its developer with no principal-agency relationship with the developer or its contractors (or subcontractors).

*Haynes v. Uponor* does not indicate otherwise. In *Haynes*, Plaintiffs purchased a home, in which Uponor piping was already installed, from a third-party Seecon Built Homes, Inc. *Haynes v. Uponor, Inc.*, No. 21-cv-05480-PJH, 2022 U.S. Dist. LEXIS 31877, at *2 (N.D. Cal. Feb. 23, 2022). As part of the purchase, the plaintiffs and Seecon entered into a Purchase Agreement that assigned the seller's warranties to the buyer. *Id.* The district court found that since this agreement expressly assigned the seller's warranties to the buyer, the plaintiffs were bound to Uponor's warranty (and associated arbitration clause). *Id.* at *6-7. Here, in contrast, Defendant has not pointed to any such express assignment of Uponor warranties from Development Solutions Riv LLC to Plaintiff Riviera. As the party moving to compel arbitration, Defendant bears the burden of proving a binding agreement. It fails to meet that burden.

Finally, Uponor argues that the Binkley Plaintiffs are judicially estopped from denying assent due to purported prior invocations of the Warranty that constitute judicial admissions. As an initial matter, there is nothing in the record to suggest that Plaintiffs ever expressly invoked the Warranty. It appears that neither Plaintiff ever filed an express warranty claim in a prior complaint in this action. Even if they had, "[w]hen a pleading is amended or withdrawn, the superseded portion ceases to be a conclusive judicial admission." *Huey v. Honeywell, Inc.*, 82 F.3d 327, 333 (9th Cir. 1996).

Rather, Uponor points to the following as purported judicial admissions: (1) Plaintiffs' cause of action for implied warranty, (2) Plaintiffs' causes of action under various consumer statutes for which reliance on misrepresentations is an essential element, and (3) Plaintiffs'

12

United States District Court
Northern District of California

mention of an "unconscionable" clause of the Warranty as a basis for CLRA liability in pre-filing CLRA letters.

Uponor's judicial admission theory suffers from several flaws. The most obviously fatal is that "Judicial admissions apply only to factual statements, not statements of law." *Maloney v. Scottsdale Ins. Co.*, 256 F. App'x 29, 32 n.3 (9th Cir. 2007) (mem.) (citing *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 227 (9th Cir. 1988)); *see also Nat'l Abortion Fed'n v. Ctr. for Med. Progress*, 134 F. Supp. 3d 1199, 1205 (N.D. Cal. 2015) ("Parties are only bound by factual allegations in a complaint, and not legal conclusions."); *A.F. v. Evans*, 2022 U.S. Dist. LEXIS 87577, at *9-10 (D. Or. May 16, 2022) (collecting circuit authority). None of the purported judicial admissions Uponor calls out are factual statements; they are causes of action and legal argument.

Moreover, to successfully invoke judicial estoppel, a party's position "must be 'clearly inconsistent' with its earlier position." *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001). Nothing in asserting a cause of action for implied warranty or misrepresentation in advertising, or asserting that a clause in a warranty agreement is unconscionable, is clearly inconsistent with Plaintiffs' position that they never assented to Uponor's warranty agreement. An implied warranty claim is not predicated on an express warranty one. And asserting that the arbitration clause contained in a warranty is unconscionable as an example of an unfair business practice does not require or even imply an invocation of that warranty. In short, none of the claims asserted herein rely on enforcement of the express warranty.

Further, the judicial estoppel inquiry also considers "whether the party has succeeded in persuading a court to accept that party's earlier position, . . . Absent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations, and thus poses little threat to judicial integrity." *Id.* (citations omitted). Here, the Court has not accepted any prior position of plaintiffs. In fact, as discussed in more detail below, the Court *agrees* with Uponor that given the Binkley Plaintiffs' total lack of knowledge or agency in the installation of Uponor piping, they cannot meet the reliance element of the consumer protection statutes that they assert. No judicial estoppel applies here to "prevent[] [plaintiffs] from playing

13

fast and loose with the courts." *Wagner v. Prof'l Eng'rs in Cal. Gov't*, 354 F.3d 1036, 1044 (9th Cir. 2004).

\*\*\*

Uponor has failed to show that Plaintiff Riviera or the Binkley Plaintiffs assented to the arbitration clause contained in its Warranty agreement.  Uponor's motion to compel arbitration is therefore **DENIED**.[3]

### B.  Associational Standing

As a threshold issue, Uponor contends that Plaintiff Riviera, a homeowner's association, lacks standing to bring damages claims on behalf of its members.

"[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *United Union of Roofers, Waterproofers, & Allied Trades No. 40 v. Ins. Corp. of Am.*, 919 F.2d 1398, 1400 (9th Cir. 1990) (quoting *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977).  While the first two prongs of this test arise directly from Article III, "the third prong of the associational standing test is best seen as focusing on [ ] matters of administrative convenience and efficiency, not on elements of a case or controversy within the meaning of the Constitution." *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 557 (1996).  Uponor challenges the third prong.

Courts in this circuit have tended to assume that when a plaintiff seeks monetary damages, individual participation naturally follows.  *See United Union of Roofers*, 919 F.2d at 1400;

---

[3] Even had Uponor been able to show assent, the plain language of the post-2012 Warranty requires arbitration only for warranty claims, not the tort causes of action in this lawsuit.  Uponor thus could not use the post-2012 warranty to compel to arbitration any non-warranty claims.

United States District Court
Northern District of California

*Waterfall Homeowners Ass'n v. Viega, Inc.*, 283 F.R.D. 571, 580 (D. Nev. 2012), on reconsideration, No. 2:11-CV-01498-RCJ, 2012 WL 5944634 (D. Nev. Nov. 26, 2012).  But "None of these cases establishes a rigid rule precluding associational standing in all cases where organizations seek to bring damages claims on behalf of their individual members."  *Sonoma Cnty. Ass'n of Retired Emps. v. Sonoma Cnty.*, No. C 09-4432 CW, 2015 WL 1870841, at *4 (N.D. Cal. Apr. 23, 2015).  In *Sonoma County*, the district court found that the potential limited participation of the association's members did not threaten administrative convenience such that prudential concerns barred standing.  *Id.* (collecting circuit decisions allowing associational standing with a limited amount of individualized proof).

In this case, Plaintiff Riviera asserts that:

> "[Plaintiff] does not seek to recover money damages on behalf of individual unit owners or members, and no individualized proof from absent members is required to establish liability or damages. The requested relief sought runs directly to Plaintiff for harms to common property and association-managed systems. Plaintiff seeks damages and equitable relief only for the Association's own injuries to common property and association-incurred costs. Plaintiff does not seek, and will not need to prove, any individual unit owner's personal damages. Plaintiff expressly disclaims any claim to recover individual unit owners' personal damages." Riviera FAC ¶ 10.

Thus, it is the association's damages qua association that is asserted herein.  Individual damage claims of the condo owners are not being asserted by the association.  Clearly, then, the association has standing.  There is no reason why individual members would need to participate in the lawsuit to prove their individual claims in order to vindicate the association's claim.   Those owners have only an undifferentiated interest in the association and have no direct control as individuals over the association outside of the association's organization structure.  Further, even if some individual participation by the members were ultimately needed to establish damages (*e.g.* as witnesses), the prudential concerns about individual participation articulated in *United Union of Roofers* still favor associational standing for Plaintiff Riviera.  *See Sonoma Cnty. Ass'n*, 2015 WL 1870841, at *4  ("The potential limited participation by some members of SCARE is not sufficient to defeat associational standing."); *Alliance for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 651 F.3d 218, 230 (2d Cir. 2011) ("'The fact that a limited amount of individuated proof may be

necessary does not in itself preclude associational standing.'"). Uponor's motion to dismiss for lack of association standing is **DENIED**.

### C. Striking of Class Allegations

Uponor moves to strike Plaintiffs' class claims. Although "class allegations may be stricken at the pleading stage, the granting of motions to dismiss class allegations before discovery has commenced is rare." *In re Wal-Mart Stores, Inc. Wage & Hour Litig.*, 505 F. Supp. 2d 609, 615 (N.D. Cal. 2007). "[D]ismissal of class allegations at the pleading stage should be done rarely and[ ]the better course is to deny such a motion because the shape and form of a class action evolves only through the process of discovery." *Id.*; *Brazil v. Dell Inc.*, No. 07-cv-01700-RMW, 2008 WL 4912050, at *3 (N.D. Cal. Nov. 14, 2008) ("Courts are likely hesitant to resolve class issues early because the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action."). Accordingly, a court can dismiss class allegations at the pleadings stage only in the rare circumstance where the court concludes that it is "possible to determine from the *pleadings alone* [uninformed by any possible factual development] that the class requirements cannot possibly be met." *In re Wal-Mart Stores*, 505 F. Supp. 2d at 615 (emphasis added); *Lewis v. Wells Fargo & Co.*, No. 08-cv-02670-CW, 2009 WL 1033823, at *2 (N.D. Cal. Apr. 16, 2009) ( "Plaintiffs are entitled to develop their claims, class or otherwise, through discovery.").

#### 1. The 1625 Riviera Class

The proposed class for the 1625 Riviera Action is:

> "All incorporated condominium common interest developments ('CIDs') in the United States that: (1) own or owned properties with Uponor Aqua-PEX potable water systems—which failed, degraded, or leaked from January 1, 2010, to the date of class notice and (2) did not make a warranty claim to Defendant." Riviera FAC ¶ 49.

Uponor argues that the class is not ascertainable. But "Rule 23 neither provides nor implies that demonstrating an administratively feasible way to identify class members is a

16

United States District Court
Northern District of California

prerequisite to class certification" and the Ninth Circuit has not adopted an "ascertainability" requirement. *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1133, n.4 (9th Cir. 2017). Also, "post-judgment claims forms and other tools can be used to allow defendants to test a class member's purported entitlement to damages and to apportion damages appropriately between class members." *In re Lidoderm Antitrust Litig.*, No. 14-MD-02521-WHO, 2017 WL 679367, at *25 (N.D. Cal. Feb. 21, 2017). In short, even if ascertainability is a cognizable requirement, it is premature to determine now whether that requirement can be met.

Uponor also argues that the class is subject to numerous fact-intensive individual inquiries, including (1) whether a property has Uponor's piping installed (2) whether the product has degraded or leaked (3) whether there was some other cause of the defect (4) whether the problems caused damage to personal property (5) whether the product was installed originally or as a replacement (6) whether a condominium's governing documents require pre-dispute resolution efforts (7) whether an arbitration agreement applies, and (8) determining the nature of Uponor's representations to developers, contractors, and plumbers. Dkt. No. 25 at 15-16. However, a class may be certified under Rule 23(b)(3) despite potential fact-intensive inquiries so long as Plaintiffs can show that there are questions that are common and that commonalities predominate over individual issues. That is a matter better determined in the context of a motion for certification after discovery.

On reply, Uponor cites to a district court decision rejecting Uponor's arguments to strike but finding at the motion to dismiss stage that in a class action against Uponor, individual issues would predominate. *Carrico v. Uponor, Inc.*, No. 3:23-CV-00497, 2025 WL 967542, at *25 (M.D. Tenn. Mar. 31, 2025). The court was particularly concerned that "determining whether defects in the PEX installed in the putative members' homes, as opposed to faulty installation or other problems, caused the leaks" would require individualized inquiry. *Id.* But here, Plaintiffs specifically allege that the piping defect causes the pipes to degrade early and that the pipes are defective even before a leak occurs. *See* Riviera FAC ¶ 36 (alleging that the defect causes "premature oxidative failure" which in turn "causes leaks, loss of use, wall cracking, other failures, and other property damage" and "reduces the normal and expected useful life of the

installed pipe"); *see also* Binkley Comp. ¶ 20 (alleging "defects that would cause the pipe to crack, leak and fail prematurely" at the time of installation), ¶ 161 (alleging that Uponor knew of the "risk to consumers of property damage" from the defects).

Whether this substantial common question predominates over questions regarding the causation of particular leaks cannot be determined at this early juncture. The Court cannot find at this early stage that "the class requirements cannot possibly be met." *In re Wal-Mart Stores*, 505 F. Supp. 2d at 615; s*ee also Sonneveldt v. Mazda Motor of Am., Inc.*, No. 8:19-cv-01298-JLS-KES, 2022 U.S. Dist. LEXIS 219297, at *107 (C.D. Cal. Oct. 21, 2022) (common design defect can be sufficient to cause common issues to predominate).

Furthermore, even if individual questions predominate as to causation or damages, bifurcation or certification of an issue class as to the alleged defects may still be appropriate. *See e.g. Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) ("Even if the common questions do not predominate over the individual questions so that class certification of the entire action is warranted, Rule 23 authorizes the district court in appropriate cases to isolate the common issues under Rule 23(c)(4)(A) and proceed with class treatment of these particular issues."); *Leyva v. Medline Industries, Inc.*, 716 F.3d 513 (9th Cir. 2013) ("In this circuit . . . damage calculations alone cannot defeat class certification."); *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1168 (9th Cir. 2014) (affirming bifurcating of class liability and damages); *Ronduen v. Geo Grp., Inc.*, No. EDCV 23-0481 JGB (SHKx), 2025 U.S. Dist. LEXIS 218351, at *28 (C.D. Cal. Sep. 26, 2025) (granting issue class in chemical tort case); *c.f. In re Pac. Fertility Ctr. Litig.*, No. 18-cv-01586-JSC, 2020 U.S. Dist. LEXIS 110754, at *26 (N.D. Cal. June 23, 2020) (denying certification after finding product liability issue class satisfied all factors except superiority).

The motion to strike Plaintiff Riviera's class allegations is **DENIED**.

2. The Binkley Plaintiffs Class

The proposed Binkley class covers:

> "All persons and entities that own residential properties in the state of California in which UPONOR PEX pipe manufactured and installed after 2010, or who replaced their UPONOR PEX pipe manufactured

18

after 2010." Binkley Compl. ¶ 193.

In addition to repeating the "ascertainable" and "fact-intensive" analysis arguments made above, Uponor also argues that the Binkley class is overbroad because it includes homeowners who have not experienced any cracking, leaks, or property damage.

While "a court must consider whether the possible presence of uninjured class members means that the class definition is fatally overbroad," the Ninth Circuit has held that Rule 23 permits "certification of a class that potentially includes more than a de minimis number of uninjured class members." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 669, n.14 (9th Cir. 2022). "Ultimately, the problem of a potentially over-inclusive class can and often should be solved by refining the class definition rather than by flatly denying class certification on that basis." *Id.* at n.14 (citation and quotations omitted). Moreover, it is not clear that a homeowner with defective piping must await an actual leak and resulting damage before asserting a viable claim; there may be cognizable injury even before the onset of a leak. *C.f. Siqueiros v. GM LLC*, No. 16-cv-07244-EMC, 2021 U.S. Dist. LEXIS 169326, at *19 (N.D. Cal. Sep. 7, 2021) (class members did not need to suffer the effects of the defect to have standing because they had already suffered a concrete past injury by overpaying for the defective product). This issue is best addressed at the class certification stage.

The motion to strike the Binkley Plaintiffs class allegations is likewise **DENIED**.

### D. Economic Loss Rule

Uponor asserts the economic loss rule to preclude Plaintiffs' recovery of repair, replacement, and loss-of-value damages for the pipes themselves. "The economic loss rule requires a purchaser to recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise." *Robinson Helicopter Co., Inc. v. Dana Corp.*, 34 Cal. 4th 979, 988 (Cal. 2004); *see also Sheen v. Wells Fargo Bank, N.A.*, 12 Cal. 5th 905, 922 (Cal. 2022) ("In general, there is no recovery in tort for negligently inflicted 'purely economic losses,' meaning financial harm unaccompanied by physical or property damage.").

The California Supreme Court established the economic loss rule in *Seely v. White Motor Co.,* 63 Cal.2d 9, 18 (Cal. 1965). In doing so, the *Seely* Court drew a line between the obligations of products liability and warranty law. In products liability law, a manufacturer is held liable to the ultimate consumer, even without privity of contract, for consequential physical injuries. In contrast, warranty law holds a manufacturer liable if the quality of its product does not live up to the manufacturer's promises. The *Seely* Court explained:

> "The distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary and does not rest on the 'luck' of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products. We concluded that the nature of this responsibility meant that a manufacturer could appropriately be held liable for physical injuries (including both personal injury and damage to property other than the product itself), regardless of the terms of any warranty. But the manufacturer could not be held liable for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands." *Id*.

The latter damages (loss of value resulting from the breach of warranty) is recoverable under contract law, not tort law. *Seely* further explained that the defendant would be liable for repair damages because the manufacturer had provided a warranty, but that "[h]ad defendant not warranted the truck, but sold it 'as is,' it should not be liable for the failure of the truck to serve plaintiff's business needs." *Id.* at 16. If the liability rules of tort applied in such an instance, "the manufacturer would be liable even though it did not agree that the truck would perform as plaintiff wished or expected it to do." *Id.* at 17. The Court rejected imposing liability of such "unknown and unlimited scope" that "could not be disclaimed." *Id*.

A plaintiff may recover in tort under the economic loss doctrine "when a product defect causes damage to 'other property,' that is, property *other than the product itself*," whereas "[t]he law of contractual warranty governs damage to the product itself." *Jimenez v. Superior Court*, 29 Cal. 4th 473, 483 (Cal. 2002) (emphasis in original). The "economic loss" that may not be recovered in tort consists of "damages for inadequate value, costs of repair and replacement of the defective product or consequent loss of profits—without any claim of personal injury or damages to other property." *Robinson Helicopter*, 34 Cal. 4th at 988. In short, the economic loss rule

covers normal contract damages.

Less clear is whether the economic loss rule's restriction of economic loss recovery under a tort cause of action applies when the relationship between the parties is not governed by warranty or contract. The Ninth Circuit has stated in dicta that "*Whether or not* the plaintiff is in a contractual relationship with the manufacturer, the plaintiff can sue the manufacturer in tort only for damages resulting from physical injury to persons or to property other than the product itself." *Giles v. GMAC*, 494 F.3d 865, 874 (9th Cir. 2007) (emphasis added). Likewise, a California Court of Appeal has noted stated that the "economic loss rule applies, *inter alia*, where the parties are in contractual privity and the plaintiff's claim arises from the contract" – seeming to imply that the rule is not necessarily limited in its application to parties who are in contractual privity. *Moore v. Centrelake Med. Grp.*, Inc., 83 Cal. App. 5th 515, 535 (Cal. App. 2022) (emphasis added). But in a subsequent unpublished case*, Kalitta Air, L.L.C. v. Cent. Tex. Airborne Sys.*, 315 F. App'x 603, 604 (9th Cir. 2008) (mem.), the Ninth Circuit panel treated as an open question "whether, under California law, a plaintiff who is not in privity with the defendant may recover purely economic loss in actions for negligent performance of services and negligent misrepresentation."

District courts in this circuit have split on this issue. *Compare Veteran's Rideshare, Inc. v. Navistar Int'l Corp.*, No. 20-cv-01304-BAS, 2021 WL 2206479, at *4 (S.D. Cal. June 1, 2021) ("The absence of privity between parties to a lawsuit has been found to preclude the application of the economic loss rule") and *UMG Recordings, Inc. v. Glob. Eagle Ent., Inc.*, No. CV 14-3466 MMM (JPRx), 2015 U.S. Dist. LEXIS 192159, 2015 WL 12746208, at *11 (C.D. Cal. Oct. 30, 2015) ("If there is no contractual relationship between a plaintiff and a defendant, then defendant cannot invoke the economic loss rule.") *with Agricola Cuyuma SA v. Corona Seeds, Inc.*, No. CV 17-8220-DMG (SKx), 2021 U.S. Dist. LEXIS 170970, at *4 (C.D. Cal. June 25, 2021) ("To apply the economic loss rule only in cases where the parties are in contractual privity would undermine the core rationale of *Seely,* not to mention conflict with its holding.").

It appears that the issue has not been authoritatively decided, and thus it may still be argued that where a lack of privity removes the option to sue in contract, the economic loss rule

United States District Court
Northern District of California

should not apply.  There is a certain degree of fairness inherent in that argument.

One purpose of the economic loss rule is to "prevent[] the law of contract and the law of tort from dissolving into one another."  *Robinson Helicopter*, 34 Cal. 4th at 988.  As the Ninth Circuit has observed in construing Washington's economic loss rule "[i]f the core of the economic loss rule is the allocation of risk through contract," it is "unclear" how "the contract-tort distinction that is central to the economic loss rule applies" when the parties lack privity and no contract claim may be asserted.  *Affiliated FM Ins. Co. v. LTK Consulting Servs. Inc.*, 556 F.3d 920, 921 (9th Cir. 2009).  Where warranty and contract law are inapplicable, the economic loss rule is not needed to preserve a manufacturer's ability to control the terms of its liability by contract.

But the rationale for the economic loss rule set forth in *Seely* went beyond maintaining a line between contract and tort.  *See Giles v. General Motors Acceptance Corp.*, 494 F.3d 865, 873 (9th Cir. 2007) (economic loss rule is "intended to maintain traditional limits on manufacturers' liability").  The *Seely* Court emphasized the "nature of the responsibility a manufacturer" undertakes, drawing a distinction between physical injuries and "the level of performance" of a manufacturer's product.  *Seely*, 63 Cal. 2d at 18.  For physical injuries, liability appropriately arises from the injury itself but when damages concerned a product's performance issues, a manufacturer is only liable if it "agree[d] that the product was designed to meet the consumer's demands."  *Id*.  This line in *Seely*'s reasoning suggests that if a plaintiff suffers an economic loss, even if no remedy is available in warranty or contract, tort law may not step in to impose a duty not voluntarily undertaken by the manufacturer.  *See Agricola*, 2021 U.S. Dist. LEXIS 170970, at *5 (reasoning that the lack of remedy obtained by applying the economic loss rule when lacking privity "is precisely the point" of *Seely*).  In short, it may be argued that in the absence of a contractual agreement, manufacturers should be presumptively protected from liability stemming from a product's performance in relation to expectations in the market.

The Court need not decide whether the economic loss rule truly precludes contract-type damages when the law of warranty or contract is unavailable, because in this case, a warranty *was* available.  While both sets of Plaintiffs, evidently for tactical reasons, disclaim any privity of

22

contract or warranty, it cannot be said no warranty was available to them. The Uponor Warranties, by their terms, apply to "owner(s) of the real property in which such products [Uponor's piping] are installed," even when those owners were not the purchasers of the pipes and have no other relationship with Uponor. Dkt. No. 23-2. As discussed above, warranties (such as Uponor's) impose a one-sided obligation: they oblige Uponor to perform the obligations of the warranty, if called upon to do. Plaintiffs have chosen not to invoke that warranty; they instead rely on the law of tort. In doing so, it is fair to hold them to the restrictions of tort law, including the economic loss rule.

The economic loss rule thus applies to the cases at bar and precludes Plaintiffs from recovering damages for the "inadequate value, costs of repair and replacement of the defective product or consequent loss of profits." *Robinson Helicopter,* 34 Cal. 4th at 988. This means that Plaintiffs may not recover for the cost of repairing or replacing the pipes, or recover on an overpayment or diminished value theory based on the pipe's failure to perform to Plaintiffs' expectations. Plaintiffs may still recover for damages to other property caused by the leaking pipes.

The Court notes that this application of the economic loss rule produces a somewhat ironic result. Plaintiffs may recover for the consequential damages of the pipes' failure, but not the more direct damage to the pipes themselves. The damages scenario resembles a donut and its hole — the most immediate harm (the pipes themselves) has been cut out of the center. Instead, Plaintiffs are limited to recovery of consequential peripheral harm – the donut but not the hole. In many cases, recovery of such donut-hole damages is inconsequential. When a toaster malfunctions, causing a house fire, a potential $100 dollars in toaster replacement damages is relatively insignificant. But where the product is piping, the donut hole may represent the larger part of the recovery. Here, however, any inequitable impact of the economic loss rule is mitigated by the fact that Plaintiffs had an opportunity to pursue recovery of the donut hole damages via the Uponor warranty.

**E.  Displacement of Negligence Claim by the Right to Repair Act**

23

The donut-hole damages issue has been addressed in part by statute in the construction defects context. Passed in 2002, California's Right to Repair Act (SB 800) was a "comprehensive construction defect litigation reform" statute.[4] *McMillin Albany LLC v. Superior Court*, 4 Cal. 5th 241, 246 (Cal. 2018); Cal. Civ. Code, §§ 895–945.5. The Act regulates construction defect disputes, providing, *inter alia*, statutorily enumerated construction standards, pre-litigation dispute resolution procedures, and economic loss damages where economic loss damages would otherwise be unavailable. *See* Cal. Civ. Code, §§ 896, 906, 944. The California Supreme Court has held that for construction defect actions based on property damage (as opposed to personal injury) the Act generally displaces common law remedies (including the normal strictures of the economic loss doctrine). *See McMillin*, 4 Cal. 5th at 246. For construction defect lawsuits that fall under the Act, the Act is the exclusive remedy available. *Id.* Here, the parties dispute whether Plaintiffs' claims fall under the Act, such that the Act displaces Plaintiffs' common law negligence claim.[5] Plaintiffs' primary argument is that class actions fall outside the Act.

The only mention of class actions in the Right to Repair Act appears in Section 931 ("Claim combined with other causes of action"). In *McMillan*, the California Supreme Court described Section 931 as containing "a list of claims that are exempt from the exclusivity of the Act." *McMillin*, 4 Cal. 5th at 252. Section 1931 states:

> "If a claim combines causes of action or damages not covered by this part, including, without limitation, personal injuries, class actions, other statutory remedies, or fraud-based claims, the claimed unmet standards shall be administered according to this part, although evidence of the property in its unrepaired condition may be introduced to support the respective elements of any such cause of action. As to any fraud-based claim, if the fact that the property has been repaired under this chapter is deemed admissible, the trier of fact shall be informed that the repair was not voluntarily accepted by the homeowner. As to any class action claims that address solely the incorporation of a defective component into a residence, the named and unnamed class members need not comply with this chapter."

---

[4] The Act is not to be confused with California's 2024 Right to Repair Act (SB 244), which requires manufacturers to provide consumers with means to repair existing consumers items. Despite the identical name, the acts are unrelated.

[5] The Act "expressly preserves common law strict liability claims" brought against manufacturers. *State Farm Gen. Ins. Co. v. Oetiker, Inc.*, 58 Cal. App. 5th 940, 952 (Cal. 2020). Accordingly, the Act does not preclude Plaintiffs from bringing their strict products liability claim.

24

In *Kohler Co. v. Superior Court,* the Court of Appeal construed the "somewhat obtuse" and "contradictory" language regarding class actions under the Act. 29 Cal. App. 5th 55, 66-67 (Cal. App. 2018). The *Kohler* court began by observing that "the Supreme Court and other courts generally have viewed the first sentence of section 931 to provide a (nonexclusive) list of exclusions from the Act." *Id.* at 66 (citing *McMillin*, 4 Cal. 5th at 252, 254). The list of exclusions is "provided in the context of explaining the application of the Act in a lawsuit that includes both claims under the Act alleging violations of the section 896 and/or section 897 standards and claims that are 'not covered by'—i.e., excluded from—the Act." *Id.* While the inclusion of "class actions" in the list of excluded claims "at first glances" appears to be an "unambiguous exclusion of class actions," "ambiguity is introduced when the first sentence is read in conjunction with the last sentence." *Id.* at 67. The last sentence, by exempting certain class actions, "seems to suggest that at least some class actions are allowed under the Act." *Id.*

*Kohler* ultimately determined that the last sentence of the section "carves out a limited exception to the exclusion of class actions—for 'claims that address solely the incorporation of a defective component into a residence' (§ 931)—and waives the prelitigation procedures for those class action claims." *Id.* at 69-70. Other than this very narrow exception, class actions are excluded from the Act, and are thus not displaced by it. *Id.* at 69; *see State Farm Gen. Ins. Co. v. Oetiker, Inc.*, 58 Cal. App. 5th 940, 952 (Cal. App. 2020) ("Nothing in the Act restricts a homeowner or its insurer from bringing causes of action which fall outside of the Act.") (citing *McMillin,* 4 Cal.5th at 259).

Plaintiffs' claims here do not fall into this narrow exception to the class action exclusion for "claims that address solely the incorporation of a defective component into a residence." *Kohler* held that when a defective product incorporated into a residence causes a violation of the Act's statutory building standards and involves damage to other components of the home, the claim does not "*solely*" concern the incorporation of a defective component into a residence." *Kohler*, 29 Cal. App. 5th at 71-72 (emphasis in original). Here, similar to *Kohler*, the piping is alleged to have leaked and degraded early, which violates the Act's building standards, and to have caused damage to other aspects of the home. *See* Cal. Civ. Code § 896(a)(14) & (15)

United States District Court
Northern District of California

(leaking pipes violate residential construction standards). As in *Kohler*, this places the claim outside the exception and back within the class action exclusion.

Further, *Kohler* held that even if such a claim "could be deemed to address solely the incorporation of a defective component," the claim could still not be brought under the act if the allegedly defective product was a manufactured product, which is subject to a separate exclusion. *Id.* at 72. As in *Kohler*, the product at issue here – commercial piping – is a manufactured product, and for this additional reason also falls outside the exception to the exception.

Accordingly, Plaintiffs' class action is outside the scope of the Act, meaning that the Act does not require dismissal of Plaintiffs' negligence claim. Uponor's motion to dismiss on this basis is **DENIED**.

### F. Causation

"[T]o recover from a manufacturer, a plaintiff must prove that a defect caused injury." *Merrill v. Navegar, Inc.*, 26 Cal. 4th 465, 479 (Cal. 2001). Proximate cause in product defect cases is "typically 'a question of fact which cannot be decided as a matter of law from the allegations of a complaint' unless 'the facts are such that the only reasonable conclusion is an absence of causation.'" *Hughes v. Apple, Inc.*, 723 F. Supp. 3d 693, 707 (N.D. Cal. 2024) (quoting *Modisette v. Apple Inc.*, 30 Cal. App. 5th 136, 152 (Cal. App. 2018)). Uponor argues that by failing to adequately account for "obvious alternate explanations" for the leaks, such as faulty installation, Plaintiffs do not sufficiently plead causation. Dkt. No. 25 at 19.

Drawing all inference in favor of Plaintiffs, their complaints plausibly plead causation and preclude alternate explanations such as faulty installation. Plaintiff Riviera sets forth a theory that Uponor's coating process prematurely burns antioxidants off the pipe surface, leading to early oxidation. Consistent with this theory, Plaintiff Riviera pleads that the leaks were caused by pinholes and cracks at the "run of the pipe." Riviera FAC ¶¶ 3, 39. The location and manner of these leaks support Plaintiff Riviera's theory that the leaks are caused by defects in the PEX material, and do not support a faulty installation theory. Likewise, the Binkley Plaintiffs allege a detailed and plausible theory that Uponor's manufacture process is vulnerable to premature

26

oxidation for multiple reasons.  The Binkley Plaintiffs include in their Complaint numerous photographs showing that the leaks at issue occurred in the body of the pipe, away from the fitting.  Binkley Compl. ¶ 134.  The location and nature of the pictured leaks support the Binkley Plaintiffs' theory and do not support a faulty installation theory.  The Binkley Plaintiffs have additionally pled that the temperature and pressure of their houses were within the allowable tolerance of the Uponor piping, ruling out another potential alternate explanation. Binkley Compl. ¶¶ 38, 54, 68, 81.  Plaintiffs more than satisfy the pleading standard.

Uponor's motion to dismiss for failure to plausibly plead causation is **DENIED**.

### G. Implied Warranty Claims (Binkley Plaintiffs only) [6]

Under California law, a plaintiff asserting breach of implied warranty "must stand in vertical contractual privity with the defendant." *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1023 (9th Cir. 2008).  "A buyer and seller stand in privity if they are in adjoining links of the distribution chain." *Id.*  "Thus, an end consumer [] who buys from a retailer is not in privity with a manufacturer." *Id.*  This rule has an exception in the case where an end-consumer relies on a manufacturer's written labels or advertisements, but as discussed above and in more detail below, Plaintiffs did not so rely.  *Id.*

The Binkley Plaintiffs concede that they are not in vertical privity with Uponor, and thus their implied warranty claim must be dismissed.  Dkt. No. 28 at n.1.  The Binkley Plaintiffs maintain, however, that their separate claim of implied warranty under the Song-Beverly Act, which does not require privity, may proceed.  *Id.* at 12; *see e.g., Ballesteros v. Ford Motor Co.*, 109 Cal. App. 5th 1196, 1218 (Cal. App. 2025) ("The Song-Beverly Act explicitly governs manufacturer warranties and does not require privity.").

Uponor argues that the Song-Beverly implied warranty claim should be dismissed because the piping is not a consumer good within the meaning of the act, Plaintiff is not a "buyer" under the act, the claim is time-barred, and Uponor disclaims implied warranties in its warranty.  The

---

[6] Plaintiff Riviera did not assert an implied warranty or Song-Beverly claim.

Song-Beverly Act applies to a "buyer" of consumer goods, where buyer is defined as "any individual who buys consumer goods from a person engaged in the business of manufacturing, distributing, or selling consumer goods at retail."  Cal. Civ. Code § 1791 (Definitions); § 1791.1. (Implied warranty; definition; duration; remedies of buyers).  The Binkley Plaintiffs each allege that the Uponor piping was already installed in their homes when they bought their homes.  They did not buy the pipes from a manufacturer, distributor or seller of consumer goods, and hence they are not "buyers" under the Act.  Compl., ¶¶ 39, 55, 69, 82, 244, and 289.

The Binkley Plaintiffs' claims for Implied Warranty and Song-Beverly Act Implied Warranty are **DISMISSED**.

### H.  Consumer Claims

"[A] plaintiff must allege actual reliance in order to have standing to pursue [misrepresentation or nondisclosure-based] UCL and FAL claims."  *Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1020 (9th Cir. 2020); *see also In re Tobacco II Cases*, 46 Cal. 4th 298, 306 (Cal. 2009); *Lagrisola v. N. Am. Fin. Corp.*, 96 Cal. App. 5th 1178, 1193 (Cal. App. 2023) (dismissing omission-based claim for lack of reliance).  Similarly, "For fraudulent omission claims under the CLRA,[a]n essential element . . . is actual reliance."  *Mansfield v. StockX LLC*, No. 25-cv-04250-RFL, 2025 U.S. Dist. LEXIS 197881, at *15 (N.D. Cal. Oct. 3, 2025).  Finally, fraud by concealment claims require as an element "justifiable and actual reliance" on the omission.  *Rattagan v. Uber Techs., Inc.*, 17 Cal. 5th 1, 44 (Cal. 2024).  While a "presumption, or at least an inference of reliance arises wherever there is a showing that a misrepresentation was material," reliance is still an "essential element" that is "proved by showing that the defendant's misrepresentation or nondisclosure was 'an immediate cause' of the plaintiff's injury-producing conduct."  *In re Tobacco II Cases*, 46 Cal. 4th at 327, 326.

Each of the Binkley Plaintiffs explicitly alleges that they had *no knowledge* that Uponor pipes were installed in their homes until after the leaks occurred.  Binkley Compl. ¶ 39 ("Plaintiff Binkley had no knowledge that UPONOR PEX pipe was installed in his home until after the leak and he observed the writing on the pipe."); *id.* ¶ 55 ("Plaintiff Chan had no knowledge that

United States District Court
Northern District of California

UPONOR PEX pipe was installed in his home until after the leak and he observed the writing on the pipe while making a repair to the leaking pipe."); *id.* ¶ 69 ("Plaintiff Vogelgesang had no knowledge that UPONOR PEX pipe was installed in his home until after the leak and he observed the writing on the pipe."); *id.* ¶ 82 ("Plaintiff Lising had no knowledge that UPONOR PEX pipe was installed in her home until after the leak and she observed the writing on the pipe.").  While a failure to disclose a known risk of premature leaking may well be material enough to create a presumption of reliance in a consumer case, any such presumption is no help to the Binkley Plaintiffs, who have not alleged with any specificity how they could have learned about the defective pipes had the defect been disclosed and how they relied on any misrepresentation or nondisclosure by Uponor.

Unable to assert their own direct reliance, Plaintiffs instead argue that had Uponor publicly made appropriate disclosures, these disclosures would have trickled down to Plaintiffs, causing them to not buy homes with Uponor piping.  For this theory, Plaintiffs relied at oral argument on *Tapia v. Davol*,[7] a patient's lawsuit against a manufacturer for a defective medical patch.  *Tapia v. Davol, Inc.*, No. 15cv179-GPC(JLB), 2015 U.S. Dist. LEXIS 151168 (S.D. Cal. Nov. 6, 2015).  In *Tapia*, the patient had not purchased the patch from the manufacturer; rather, it was implanted by the plaintiff's doctor during a surgery. *Id.* at *8.  The court found that the plaintiff adequately alleged that the manufacturer made fraudulent omissions to plaintiff's doctor and that had the manufacturer disclosed the true facts to his doctor, his doctor would not have prescribed the patch. *Id.* at 16.   But the causation in *Tapia* is not analogous to the argued chain of causation here.  The medical device context differs considerably from the consumer product one.  For medical devices, the "learned intermediary" doctrine provides that a manufacturer's duty to warn runs to the doctor, not the patient. *Id.* at *11.  This doctrine recognizes that for medical devices, the doctor, not the patient, is the relevant decision-maker.  Disclosure to the doctor who makes the choice of the patch would directly affect the plaintiff patient.  Plaintiffs here point to no similar relationship that

[7] In briefing, Plaintiffs cited a prior order in the case, in which the court *granted* Defendant's motion to dismiss fraudulent concealment claims (with leave to amend).  Dkt. No. 28 at 14 (citing *Tapia v. Davol, Inc.* 116  F. Supp. 3d 1149, 1164 (S.D. Cal. 2015)).  The Court assumes that Plaintiffs intended to cite the later order, which denied dismissal.

United States District Court
Northern District of California

created a direct and proximate relationship between the misrepresentation by Uponor and the plaintiff's ultimate injury. It would be one thing if Plaintiffs alleged that an agent of theirs, such as a plumbing contractor, relied on Uponor's improper omissions. That would be more analogous to *Tapia*. But the Binkley Plaintiffs purchased their homes from a third-party seller, and their reliance claim requires that the seller of the home would have learned about the Uponor defect, that the seller would then have passed on that knowledge to Plaintiffs, and that the Plaintiffs would have not purchased their homes. The seller is not similarly situated to the doctor in *Tapia* and the causal chain asserted herein is far more attenuated and speculative than that in *Tapia*.[8] The Binkley Plaintiffs have not stated a viable claim of misrepresentation or omission.

Plaintiff Riviera has likewise not adequately plead a viable misrepresentation or omission-based claim. The Riviera FAC makes clear that the purchase of the Uponor piping was handled by its developer entity before the condo association was created and before the condominium owners bought their condominiums. As with the Binkley Plaintiffs, the causal chain between the alleged misrepresentation or omission is too remote and attenuated.

Uponor's motion to dismiss is **GRANTED** with leave to amend as to Binkley Plaintiffs' claims under the UCL, CLRA, FAL and fraud by concealment and as to Plaintiff Riviera's claim under the UCL.[9]

### I. Unjust Enrichment

Uponor first argues that unjust enrichment is not a proper cause of action under California law. *In re Sony Gaming Networks and Customer Data Sec. Breach Litig.,* 903 F. Supp. 2d 942, 973-74 (S.D. Cal. 2012). But "[w]hen a plaintiff alleges unjust enrichment, a court may 'construe the cause of action as a quasi-contract claim seeking restitution.'" *Astiana v. Hain Celestial*

---

[8] Plaintiffs also cite *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1226 (9th Cir. 2015), which found reliance sufficiently stated when Plaintiffs, who bought a Ford car at an authorized Ford dealership, alleged that they would have been aware of a disclosure through the dealership. *Id.* at 1227 (9th Cir. 2015). *Daniel* is distinguishable because the causal link therein is far more direct than in the case at bar.

[9] UCL and CLRA claims may be brought on theories other than misrepresentation, but as pled, both plaintiffs appear to assert misrepresentation/omission-based theories.

*Group, Inc.*, 783 F.3d 753, 762 (9th Cir. 2015).

Unjust enrichment describes "the theory underlying a claim that a defendant has been unjustly conferred a benefit through mistake, fraud, coercion, or request." *Saroya v. Univ. of the Pac.*, 503 F. Supp. 3d 986, 998 (N.D. Cal. 2020) (internal citations omitted). To allege unjust enrichment as an independent claim, "a plaintiff must show that the defendant received and unjustly retained a benefit at the plaintiff's expense." *Vallarta v. United Airlines, Inc.*, 497 F. Supp. 3d 790, 810 (N.D. Cal. 2020) (internal citations omitted). Outside certain specialized contexts, such as securities and copyright law, "the remedy of disgorgement only arises where a prior relationship between the parties subject to and benefitting from disgorgement originally resulted in unjust enrichment." *Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1106 (9th Cir. 2004); *accord Doe v. Wal-Mart Stores, Inc.*, 572 F.3d 677, 685 (9th Cir. 2009) ("The lack of any prior relationship between Plaintiffs and Wal-Mart precludes the application of an unjust enrichment theory here.").

Neither set of plaintiffs has pled a prior relationship with Uponor sufficient to provide a foundation for an unjust enrichment claim. In their unjust enrichment cause of action, the Binkley Plaintiffs plead that when they purchased their homes, a "portion of the purchase price was attributable to the purchase and installation" of the Uponor pipes. Binkley Compl. ¶ 297. This price was paid to the seller of Plaintiff's home, who paid the installer of the piping, who paid the plumbing distributor Ferguson for the system, who finally paid Uponor. *Id.* ¶¶ 298-301. Plaintiff Riviera pleads only that "Defendant has profited and benefited from the sale and installation, in the structures of Plaintiff, the Class, and the Sub-Class, of its PEX products" and that this enrichment was unjust because the piping did not live up to its expected quality. Riviera FAC at ¶¶ 57-58. Plaintiff Riviera represents condominium owners who bought condominiums with Uponor piping installed from a developer, who paid a general contractor, who paid a subcontractor, who paid a distributor, who paid Uponor. The attenuated connection between Plaintiffs and Uponor is not the kind of prior relationship that gives rise to an unjust enrichment claim. Uponor's motion to dismiss the unjust enrichment claim is **GRANTED** as to both parties.

United States District Court
Northern District of California

## V.    CONCLUSION

For the reasons stated above,

- Uponor's Motion to Compel Arbitration is **DENIED** for both the Binkley and Riviera Plaintiffs.

- Uponor's Motion to Strike Class Allegations is **DENIED** for both the Binkley and Riviera Plaintiffs.

- Uponor's Motion to Dismiss due to lack of standing for Plaintiff Riviera is **DENIED**.

- Uponor's Motion to Strike damages under the economic loss rule is **GRANTED** without leave to amend.

- Uponor's Motion to Dismiss the Negligence and Strict Liability Counts are **DENIED**.

- Uponor's Motion to Dismiss the Implied Warranty Count and Song-Beverly Count for the Binkley Plaintiffs is **GRANTED** without leave to amend.

- Uponor's Motion to Dismiss the FAL, CLRA, UCL, and fraud by concealment claims for the Binkley Plaintiffs and the UCL claim for Plaintiff Riviera is **GRANTED** with leave to amend.

- Uponor's Motion to Dismiss the Unjust Enrichment claim is **GRANTED** for both the Binkley and Riviera Plaintiffs without leave to amend.

The parties shall submit a joint proposed case schedule by 3/31/2026.

**IT IS SO ORDERED**.

Dated: 3/19/2026

_____
EDWARD M. CHEN
United States District Judge

32